# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHIINGTON, | No. 48401-3-II |
| Respondent, | |
| v. | |
| JAMES CHARLES MATHES, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — James Mathes appeals his eight convictions and his sentence arising from an incident where he kidnapped and assaulted Michelle Toste and assaulted police officers by shooting at them.[1] Mathes makes several arguments, claiming (51) the trial court erred by excluding expert witness testimony on diminished capacity, (2) his defense counsel rendered ineffective assistance by failing to request a voluntary intoxication instruction and by failing to suppress Mathes's statements to police after he requested an attorney, (3) the State committed prosecutorial misconduct by misrepresenting its burden to prove intent and by eliciting testimony commenting on Mathes's credibility, (4) cumulative error denied Mathes's right to a fair trial, (5) his convictions for both first degree kidnapping and harassment violate the prohibition against double jeopardy, and (6) the trial court erred by running his two sentences for first degree assault

---

[1] Mathes was convicted of two counts of first degree assault with firearm and law enforcement victim special allegations, one count of first degree kidnapping with domestic violence and firearm special allegations, two counts of second degree assault with domestic violence and firearm special allegations, felony violation of a no-contact order with domestic violence and firearm special allegations, felony harassment with domestic violence and firearm special allegations, and unlawful possession of a firearm.

consecutively rather than concurrently because they were not based on separate and distinct conduct. In a statement of additional grounds (SAG) for review, Mathes claims his counsel rendered ineffective assistance and the evidence collected from the crime scene should have been excluded. We disagree with all of Mathes's arguments, and we affirm his convictions and sentence.

## FACTS

### I. BACKGROUND

Mathes and Toste had a romantic relationship and a child in common. On December 30, 2013, around 8:00 PM, Mathes contacted Toste and told her to get a babysitter for their child because he wanted to see her. Both Mathes and Toste were aware that a no-contact order prohibited Mathes from contacting Toste, but the two regularly ignored the order. Toste found a babysitter, and Mathes picked her up and the two went to his mother's house around 10:00 PM.

Mathes began asking Toste if she was having affairs. When Toste denied having any affairs, Mathes accused her of lying and became agitated. Mathes then reached underneath the mattress and pulled out a gun. While in his bedroom, Mathes injected what Toste believed to be heroin. Mathes and Toste then went into the living room where they continued to talk. Mathes repeatedly asked Toste about infidelity, accused her of being married and pregnant, and accused Toste of lying when she denied having affairs.

Around 3:00 AM, Mathes asked Toste to find him some drugs so she called her daughter's best friend Hannah. While on the phone with Hannah, Toste unsuccessfully tried to hint that she was in trouble. Toste also called her daughter Stephanie to ask about drugs and continued to hint that she was in trouble by saying, "[B]ang, bang," but Stephanie did not understand. Verbatim

Report of Proceedings (Oct. 26, 2015) at 200. Toste did not feel free to tell Stephanie what was happening or to leave the house during the phone call because Mathes had the gun at her head.

Around 5:00 AM Stephanie came to Mathes's parents' house and tried to get Toste to leave with her. Mathes told Stephanie that Toste "wasn't going nowhere." VRP (Oct. 26, 2015) at 202. Toste managed to whisper to Stephanie that Mathes had a gun.

Around 6:30 AM Mathes and Toste got in his car and began driving. Toste had Mathes stop at her regular coffee shop where she tried to make eye contact with the employees to indicate she needed help. Toste did not directly ask for help because Mathes told her if she said anything he would shoot her and everyone there. Mathes and Toste drove around for about three hours. At one point Mathes shot the gun out his window and told Toste it could have been her head.

At approximately noon, Mathes and Toste returned to Mathes's mother's house. Mathes's father, Roy, pulled into the driveway immediately after them. Mathes told Roy to go into the house with them and at one point put the gun to Roy's head. Around 12:30 PM Stephanie returned to the house and Mathes asked her to find him $20,000.

Around 1:00 PM 911 called the house. With the call on speaker phone and Mathes holding the gun to her back, Toste told the operator that she was okay, she was not being held at gunpoint, and she could speak freely. The operator told them that law enforcement was outside and asked them all to go outside.

Mathes, Toste, Roy, and Stephanie went outside and saw several law enforcement officers. Mathes got into his car and ordered Toste to get in the car as well. The law

enforcement officers told Toste not to get into the car. Mathes then got out of the car, reached over the top of the car, and fired his gun at the officers.

The officers fired on and struck Mathes. The deputies secured Mathes in handcuffs, assessed his injuries, and transferred him to a hospital.

Washington State Patrol conducted the crime scene investigation. Detective Rodney Green took possession of the officer's weapons at the scene and also collected evidence including bullet casings, a magazine for bullets, a handgun, clothing and medical supplies.

III. TRIAL

The State charged Mathes with two counts of first degree assault with firearm and law enforcement victim special allegations, two counts of second degree assault (in the alternative) with firearm and law enforcement victim special allegations, first degree kidnapping with domestic violence and firearm special allegations, unlawful imprisonment (in the alternative to kidnapping) with domestic violence and firearm special allegations, second degree assault on Toste with domestic violence and firearm special allegations, second degree assault on Roy with domestic violence and firearm special allegations, felony violation of a court order with domestic violence and firearm special allegations, felony harassment with domestic violence and firearm special allegations, and unlawful possession of a firearm.

A.      *Dr. Muscatel*

Pretrial, Dr. Kenneth Muscatel testified during the first of two offers of proof regarding Mathes's diminished capacity to form intent at the time of the incident. Dr. Muscatel testified that Mathes had a chronic mental disorder consistent with bipolar disorder and a very serious substance abuse problem. When asked his opinions regarding Mathes's mental state at the time

4

of the incident relating to potential diminished capacity, Dr. Muscatel explained, "[W]hile his behavior was clearly intentional in the general sense, the question is whether he could have formed the intent to assault as opposed to engage in a bizarre version of self-defense. That's the only way that I think diminished capacity could possibly apply in this matter." VRP (Oct. 20, 2015) at 86-87. He explained that diminished capacity would change depending on the specific charge.

Dr. Muscatel went on to explain,

Now it's important that—as you know, in my report, I don't state that he had diminished capacity, but rather stated that there were elements that have to be determined—in the course of the evidence of the trial—to determine what happened and how it happened. Because that will go a long way to determining whether he acted in a manner suggesting intentionality.

. . . .

So a lot of this is going to depend on the reality of the evidence. And I didn't feel like I could interpret that for the court. The documents were complicated enough that I thought this was one that I needed to defer.

. . . .

I thought there was plenty of evidence from a variety of sources that he was in a highly impaired mental state at the time of the incident.

. . . .

The question in this case is whether that prevented him from forming the requisite intent. That I could not answer for the court.

VRP (Oct. 20, 2015) at 88-89.

Dr. Muscatel further opined that as it relates to the charges of assault on the officers, he would be unable to present any opinion in terms of diminished capacity because it appeared to be intentional conduct. He testified that there was no diminished capacity defense for the violation of a no-contact order charge, and that the "foundation is weaker" for a diminished capacity defense for the harassment charge. VRP (Oct. 20, 2015) at 94. The State asked Dr. Muscatel if

he had an opinion whether Mathes was able to form intent, and Dr. Muscatel responded that he

did not.

Following the first offer of proof, the trial court ruled to exclude Dr. Muscatel's

testimony because:

> I'm unable to find as a matter of foundation that Dr. Muscatel was able to testify to a reasonable medical certainty that Mr. Mathes was not able to form the specific intent. He doesn't know. And it's unclear to him at this point. And so I think that's problematic at this point in the case.
> I'm also relying heavily for purposes of any additional review that may take place in this case, I'm relying heavily on the analysis in *Atsbeha*.[2] My understanding is that remains good law, and I believe the cases are analogous. I believe that the evidence suggests that Mr. Mathes in this case was under the influence of delusion and mental incapacity to some extent.
> And nevertheless, he clearly acted with intent.
> He may have believed that his intentional acts were lawful, but that's not sufficient for diminished capacity.

VRP (Oct. 20, 2015) at 109-10. The trial court told Mathes that he could raise the issue again as

the case progresses based on the evidence presented.

During trial, Mathes made a second offer of proof. During this second offer of proof, Dr.

Muscatel testified that there was "no question" that Mathes suffers from a mental disorder. VRP

(Oct. 29, 2015) at 626. Mathes asked:

> [MATHES]: In your opinion, more probable than not, did that condition impair Mr. Mathes's ability to form the culpable mental state to commit the crimes charged?
> [Dr. Muscatel]: Would it impair him? Yes. Did it impair him? I don't know. This goes back to my original testimony.
> . . . .
> [MATHES]: I guess is your opinion based on a reasonable medical certainty?
> [Dr. Muscatel]: Reasonable psychological certainty since I'm a psychologist.

---

[2] *State v. Atsbeha*, 142 Wn.2d 904, 16 P.3d 626 (2001).

VRP (Oct. 29, 2015) at 626-27.

The State asked Dr. Muscatel if his opinion had changed from his first offer of proof. Dr. Muscatel responded:

> Not really, no. I mean, I can say that my degree of certainty about the presence of his mental disorder at the time, in and around the time of the incident, has deepened. That much I can say.
> In terms of my overall opinion, I look at my results and it is essentially the same.
> . . . .
> So I still could not offer the opinion that he couldn't form the requisite intent, nor could I offer that he could.

VRP (Oct. 29, 2015) at 628-29.

The trial court again ruled to exclude Dr. Muscatel's testimony, explaining:

> And so in this particular case, I'm not satisfied at this point that diminished capacity defense is available to Mr. Mathes. Again, I'm relying on the *Atsbeha* case and the testimony of Dr. Muscatel. He's not able to offer based on his testimony, I believe, any opinion as to whether or not Mr. Mathes was capable of forming the requisite intent. If he's not able to offer an opinion on that, I don't believe it's relevant under 401, 402 and ER 702.

VRP (Oct. 29, 2015) at 641.

B.     *Statements to Deputies at the Hospital*

Deputy Brittany Gray and Deputy Eric Adams, two of the deputies assigned to monitor Mathes while he was hospitalized, testified at trial. Deputy Gray testified that when she entered Mathes's room he told her he had fired shots and asked her multiple times if he had hurt anyone. She described his demeanor as coherent. The State asked Deputy Gray:

> [STATE]: So did [Mathes] seem to be genuinely interested if anybody was hurt?
> [Deputy Gray]: Yes.
> [STATE]: Did he seem to care if anybody was hurt?
> [Deputy Gray]: That's difficult for me to say, but he was definitely interested if someone had been hurt.

VRP (Oct. 27, 2015) at 492. According to Deputy Gray, Mathes told a nurse, "I fired shots which put me in this position," and asked the nurse if he had hurt anybody. VRP (Oct. 27, 2015) at 492. At some point Mathes asked Deputy Gray whether she thought he should get an attorney, and Deputy Gray reminded Mathes of his rights. Mathes asked the nurse to call his attorney, and he used the phone in his hospital room to call his parents.

Mathes told Deputy Adams that it was important for Deputy Adams to know that if Mathes had hurt anyone, it was an accident. The State asked Deputy Adams if Mathes seemed concerned about whether he had hurt anyone, and Deputy Adams answered that he was. Deputy Adams testified:

> [H]e said that he did what he did because he wanted to get hurt himself, not hurt a cop. He said he didn't expect he would live when he went out guns-a-blazing.
>  . . . .
> He didn't say specifically how many times he fired, but he said he emptied his gun.
>  . . . .
> He said he remembered lying on the ground bleeding and hearing his dad crying. He said he was happy that his girlfriend got away and was not hurt. He said he tried to reload his gun with the bullets in his pocket because he had time, but he was unable.

VRP (Oct. 27, 2015) at 502-04.

> On cross-examination, Mathes asked Deputy Adams:

> [MATHES]: Deputy, isn't it true that Mr. Mathes brought up more than a couple times about his concern about [sic] anybody got hurt?
> [Deputy Adams]: Yes.
> [MATHES]: There was a number of times during a period of time you were there, correct?
>  . . . .
> Didn't he also tell you that his intention was to hurt himself, not anybody else, especially the police? . . . .
> [Deputy Adams]: That's correct, he did. He said he did what he did because he wanted to get hurt himself, not hurt a cop.

VRP (Oct. 27, 2015) at 504-05.

C.      *Verdict and Sentence*

The jury found Mathes guilty on all the greater offenses as charged and answered all special allegations in the affirmative.  With the exception of the court order violation and harassment counts, which were sentenced below the standard range, Mathes received a standard range sentence totaling 720 months.[3]  Mathes appeals his convictions and sentence.

ANALYSIS

I. EXCLUSION OF EXPERT WITNESS

Mathes argues that the trial court deprived him of his constitutional right to present a complete defense by excluding expert witness testimony of diminished capacity.  We disagree.

We review a trial court's decision to exclude evidence for an abuse of discretion.  *State v. Lord*, 161 Wn.2d 276, 294, 165 P.3d 1251 (2007).  A trial court abuses its discretion when its decision is based on untenable grounds or untenable reasons.  *Lord*, 161 Wn.2d at 283-84.  An abuse of discretion is found when no reasonable person would take the view adopted by the trial court.  *Atsbeha*, 142 Wn.2d at 914.  "Appellate courts cannot substitute their own reasoning for the trial court's reasoning, absent an abuse of discretion."  *Lord*, 161 Wn.2d at 295.

Criminal defendants have a constitutional right to present evidence in their own defense.  *State v. Hawkins*, 157 Wn. App. 739, 750, 238 P.3d 1226 (2010).  But the evidence must be relevant; there is no constitutional right to present irrelevant evidence.  *Lord*, 161 Wn.2d at 294.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of

---

[3] This included consecutive sentences for the two first degree assault convictions.  RCW 9.94A.589(1)(b) provides that a trial court shall impose consecutive sentences for "two or more serious violent offenses arising from separate and distinct criminal conduct."

consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Diminished capacity is available as a defense when either specific intent or knowledge is an element of the crime charged. *State v. Thomas*, 123 Wn. App. 771, 779, 98 P.3d 1258 (2004). If specific intent or knowledge is an element, evidence of diminished capacity can then be considered in determining whether the defendant had the capacity to form the requisite mental state. *Thomas*, 123 Wn. App. at 779.

To support a diminished capacity defense, a defendant has to produce substantial evidence and expert testimony "demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." *Atsbeha*, 142 Wn.2d at 914. Further, that evidence must logically and reasonably connect the defendant's alleged mental condition with the asserted inability to form the required mental state to commit the crime charged. *Atsbeha*, 142 Wn.2d at 918. "It is not enough that a defendant may be diagnosed as suffering from a particular mental disorder. The diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime." *Atsbeha*, 142 Wn.2d at 921.

For expert testimony to be admissible under ER 702, that testimony must be helpful to the trier of fact. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 169, 288 P.3d 1140 (2012). Expert testimony is only helpful if it is relevant. *Morris*, 176 Wn.2d at 169. To be relevant, expert testimony must have the tendency to make a fact of consequence to the trial's outcome more or less probable. ER 401; *Atsbeha*, 142 Wn.2d at 918; *see also State v. Greene*, 139 Wn.2d 64, 73-79, 984 P.2d 1024 (1999) (expert testimony on diminished capacity and insanity not

helpful to trier of fact under ER 702 where evidence could not reliably connect symptoms to defendant's mental capacity).

A.      *The Trial Court Applied the Proper Standard*

Mathes argues that the trial court improperly excluded Dr. Muscatel's expert witness testimony because it erroneously interpreted *Atsbeha*, 142 Wn.2d at 904, as requiring an expert to testify to a reasonable medical certainty, which is an outdated foundational requirement for the admission of expert testimony on diminished capacity.  The State responds that the trial court did not misinterpret *Atsbeha*, but rather excluded Dr. Muscatel's testimony "based on its appraisal of controlling authority and its findings that the doctor's testimony was insufficient under [ER 702, 401, 402]."[4]  Br. of Resp't 14.  We agree with the State.

In its initial ruling excluding Dr. Muscatel's testimony, the trial court did emphasize that Dr. Muscatel could not offer an opinion whether, to a reasonable medical certainty, that Mathes's was unable to form the specific intent.  However, on appeal, Mathes focuses too narrowly on the trial court's use of the phrase "reasonable medical certainty," during its ruling on the first offer of proof, rather than viewing the trial court's ruling in its entirety.  Although in its first ruling the trial court noted that Dr. Muscatel was unable to testify to a reasonable medical certainty that

---

[4] Mathes equates the trial court's mention of "a reasonable medical certainty" to an inappropriate reliance on *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310 (1981).  *Edmon* set out nine foundational factors to determine the admissibility of proffered expert testimony on diminished capacity, one of which was that the expert be able to testify to an opinion with reasonable medical certainty.  *Edmon*, 28 Wn. App. at 102-103.  In *State v. Ellis*, 136 Wn.2d 498, 522-23, 963 P.2d 843 (1998), our Supreme Court declined to adopt the *Edmon* factors as absolute, and instead held that in determining the admissibility of expert testimony a trial court should consider the evidence under ER 702, 401, and 402.  Here, contrary to Mathes's contention, the trial court's consideration of whether Dr. Muscatel could testify to "a reasonable medical certainty" did not amount to strict reliance on *Edmon* as controlling authority.

No. 48401-3-II

Mathes was not able to form intent, the trial court primarily focused on how Dr. Muscatel's testimony was similar to the expert's in *Atsbeha* and whether the testimony was relevant. The trial court's proper reliance on the controlling authority of *Atsbeha* and application of the correct standard is further elucidated in its ruling on the second offer of proof.

When the trial court revisited the issue following Dr. Muscatel's testimony during Mathes's second offer of proof, the trial court explained:

> Again, I'm relying on the *Atsbeha* case and the testimony of Dr. Muscatel. He's not able to offer based on his testimony, I believe, any opinion as to whether or not Mr. Mathes was capable of forming the requisite intent. If he's not able to offer an opinion on that, I don't believe it's relevant under 401, 402, and ER 702.

VRP (Oct. 29, 2015) at 641. Contrary to Mathes's contention on appeal, the trial court did not reach its decision by erroneously interpreting *Atsbeha* as requiring an expert to testify to a reasonable medical certainty, but rather by properly applying ER 702, 401, and 402 as required by *Atsbeha*, 142 Wn.2d at 916-18.

B.    *The Trial Court Did Not Abuse Its Discretion*

We next determine whether any reasonable person would take the trial court's view that Dr. Muscatel's testimony was irrelevant under ER 401, 402, and 702.

ER 401 defines "relevant evidence":

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

ER 402 provides:

> All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible.

12

ER 702, referring to expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"Under ER 702, expert testimony will be considered helpful to the trier of fact only if its relevance can be established." *Atsbeha*, 142 Wn.2d at 917-18. In terms of diminished capacity defense, "[i]t is not enough that a defendant may be diagnosed as suffering from a particular mental disorder." *Atsbeha*, 142 Wn.2d at 921. The opinion must reasonably relate a defendant's mental disorder to impairment of the ability to form the culpable mental state to commit the crime charged. *Atsbeha*, 142 Wn.2d at 921.

Dr. Muscatel testified that there was "no question" that Mathes suffers from a mental disorder and that the mental disorder existed in and around the time of the incident. But he could not offer an opinion as to whether or not Mathes's mental disorder impaired his ability to form the requisite intent. He explained:

> In terms of my overall opinion . . . the elements of the mental disorder were very significant, and certainly were significant enough that they could have impacted his ability to form the requisite intent.
> But the other half of that assessment is going to be based on the facts of the case. And the facts of the case are jumbled enough that I cannot make that characterization for the court.
> So I still could not offer the opinion that he couldn't form the requisite intent, nor could I offer that he could.
> . . . .
> He believed he was protecting himself. This is what—this is what—you know, from the standpoint of capacity is going to be about. Did he know he was committing a crime? Was he aware of that or was he acting in this manner that he thought was protecting himself? That I can't answer for the court.

VRP (Oct. 29, 2015) at 628-30.  Dr. Muscatel went on to note that Mathes was likely "most acutely affected by the role of drugs, substances, rather than the underlying mental disorder that he had."  VRP (Oct. 29, 2015) at 632.

At most, Dr. Muscatel's opinion was that Mathes may have been responding to a delusional perceived threat.  Dr. Muscatel described that Mathes appeared to be delusional and paranoid in his thinking.  He explained, "[W]hile [Mathes's] behavior was clearly intentional in the general sense, the question is whether he could have formed the intent to assault as opposed to engage in a bizarre version of self-defense.  That's the only way that I think diminished capacity could possibly apply in this matter."  See VRP (Oct. 20, 2015) at 86-87.

Dr. Muscatel's opinion was similar to the expert testimony offered in *Atsbeha*, 142 Wn.2d at 904.  In that case, Atsbeha was charged with possession of a controlled substance with intent to deliver.  There, the expert testified that Atsbeha believed he was purchasing and delivering cocaine to a police officer as part of a drug operation sting; Atsbeha's diagnosed disorders impaired his ability to appreciate the illegality of his actions, but not his ability to act intentionally.  *Atsbeha*, 142 Wn.2d at 910, 918-19.  Our Supreme Court held that Atsbeha's belief concerning his relationship with the police officer was not evidence of impairment of his ability to form the intent to deliver the controlled substance, rather it was an indication that Atsbeha did have the ability to form intent.  *Atsbeha*, 142 Wn.2d at 920.  Atsbeha's "inability to perceive the nature and quality of his actions" was "not relevant and admissible to establish a diminished capacity defense."  *Atsbeha*, 142 Wn.2d at 920.

Likewise here, Dr. Muscatel testified that Mathes's actions were generally intentional and implied "goal-directed" behavior, but added the caveat that Mathes may have thought at the time

14

that he was primarily defending himself. As in *Atsbeha*, 142 Wn.2d at 920, that Mathes *may* have had a diminished ability "to perceive the nature of his actions" in that he erroneously believed he was acting in self-defense was not relevant and admissible to establish a diminished capacity defense as to ability to act intentionally.[5,6] The trial court's decision that Dr. Muscatel's testimony was not relevant to the defense of diminished capacity was not an abuse of discretion under the test that no reasonable person would reach the same conclusion.

## II. Ineffective Assistance of Counsel

Mathes argues that his counsel was ineffective for failing to request a voluntary intoxication instruction and for failing to seek suppression of Mathes's statements to police while he was in the hospital. We disagree.

We review ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To show ineffective assistance of counsel, a defendant must show (1) that defense counsel's performance was deficient, and (2) that the deficient performance resulted in prejudice. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

---

[5] In his reply brief, Mathes argues that under *State v. Mitchell*, 102 Wn. App. 21, 997 P.2d 373 (2000), Dr. Muscatel's testimony was sufficient for admission. Mathes contends that Dr. Muscatel testified that Mathes's mental disorder "could have" resulted in diminished capacity. Reply Br. of Appellant 6. However, Dr. Muscatel did not render an opinion that Mathes may have had a diminished capacity to *act intentionally*, rather he offered the possibility that Mathes, while acting intentionally, may have had a diminished capacity to *comprehend* that he did not need to act in self-defense.

[6] Moreover, Dr. Muscatel testified that Mathes's intent as it related to the crimes of assault on the police officers, violation of the no-contact order, harassment of Toste, or unlawful possession of a firearm was not diminished. If Mathes had the *capacity* to form the requisite intent for these crimes, he also had the *capacity* to form similar and identical intent for the crimes of unlawful imprisonment, kidnapping, and assaults on Toste and Roy.

"The threshold for the deficient performance prong is high, given the deference afforded to [the] decisions of defense counsel in the course of representation." *Grier*, 171 Wn.2d at 33. To prove deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonableness, considering all the circumstances. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Moreover, the defendant must show the absence of any conceivable legitimate tactic supporting counsel's action. *Grier*, 171 Wn.2d at 33. If Mathes fails to establish either deficient performance or prejudice, we need not inquire further. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

A.      *Failure To Request a Voluntary Intoxication Instruction*

Mathes argues that his counsel rendered ineffective assistance by failing to request a voluntary intoxication instruction. To establish ineffective assistance on this issue, Mathes must show that the trial court would have given a voluntary intoxication instruction had defense counsel requested it. *In re the Pers. Restraint of Cross*, 180 Wn.2d 664, 718, 327 P.3d 660 (2014). He does not make this showing.

When a voluntary intoxication instruction is sought, the defendant must show "(1) one of the elements of the crime charged is a particular mental state; (2) there is substantial evidence [that the defendant] ingest[ed] an intoxicant; and (3) the defendant presents evidence that this activity affected his ability to acquire the required mental state." *State v. Harris*, 122 Wn. App. 547, 552, 90 P.3d 1133 (2004) (citing *State v. Everybodytalksabout*, 145 Wn.2d 456, 479, 39 P.3d 294 (2002)). The evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged. *State v. Griffin*, 100 Wn.2d 417, 418-19, 670 P.2d 265 (1983). Evidence of

16

drinking or drug use alone is insufficient to warrant the instruction; there must be substantial evidence of the effects of the substance use on the defendant's mind or body. *State v. Gabryschak*, 83 Wn. App. 249, 253, 921 P.2d 549 (1996). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true. *State v. Foster*, 135 Wn.2d 441, 471, 957 P.2d 712 (1998).

Here, the first two requirements are satisfied. However, Mathes's claim fails because there was no evidence presented at trial that his drug use affected his ability to acquire the required mental state.

Mathes argues that the facts of his case are analogous to those in *State v. Kruger*, 116 Wn. App. 685, 67 P.3d 1147 (2003). However, *Kruger* is distinguishable. In *Kruger*, a highly intoxicated defendant resisted pepper spray, swung a beer bottle at a police officer, head butted him, and then vomited in the local jail. *Kruger*, 116 Wn. App. at 689. The *Kruger* court observed that the defense's theory focused on Kruger's inability to form the requisite intent because of his intoxication and all witnesses involved testified to the significant level of Kruger's intoxication. *Kruger*, 116 Wn. App. at 693.

Here, the only evidence of Mathes's intoxication was Toste's testimony that she saw him inject what she believed to be heroin early in the evening and that he appeared to be under the influence when he was questioning her about her infidelity. One can reasonably infer from the record that by 2:00 AM the following morning Mathes was out of drugs because he asked Toste to find him more. Mathes's intoxication was not discussed during any witness testimony. In fact, the sole defense witness, Janelle Jones, who interacted with Mathes shortly before the

17

shooting, described his demeanor as "just like every other time, just normal, happy, joking around." VRP (Nov. 2, 2015) at 671.

Given the lack of evidence connecting Mathes's drug use to an inability to form the requisite level of culpability required by his crimes, Mathes cannot show that a voluntary intoxication instruction would have been given even if Mathes's counsel had requested one at trial.[7] Under these facts, we hold that Mathes's defense counsel did not render ineffective assistance for failing to seek such an instruction.

B.      *Failure To Suppress Mathes's Statements to Police After He Requested an Attorney*

Mathes also argues that his defense counsel rendered ineffective assistance by failing to seek suppression of Mathes's statements to police while he was in the hospital under CrR 3.1.[8] We disagree.

"When counsel's conduct can be categorized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Here, Mathes's counsel made the tactical decision to use Mathes's statements to police in the hospital to bolster his argument that Mathes did not intend to inflict grievous bodily harm on the police officers. In his closing argument, Mathes emphasized his theory of the case regarding the two first degree assault against an officer charges:

---

[7] Mathes argues that Dr. Muscatel's testimony during the offer of proof proves that Mathes's ability to form the requisite intent was impaired by his voluntary intoxication. However, Dr. Muscatel's testimony did not establish this and the trial court excluded Dr. Muscatel's testimony from trial.

[8] Mathes reiterates this argument in his statement of additional grounds for review. Because we address it fully here, it is not addressed again in the SAG section of this opinion.

> And this all goes to the question of whether or not the prosecution has met their burden, met their responsibility to convince you beyond a reasonable doubt that Mr. Mathes intended to inflict great bodily harm.
>
> Now, when you look at all of the testimony as it relates to that particular issue, whether he intended to inflict great bodily harm, think of the statements made while Mr. Mathes is in the hospital to Deputy Adams and Deputy Gray. The statements he made while he was there, did I hurt anybody? I certainly didn't want to, especially I didn't want to hurt the police.
>
> Does that indicate an intent to inflict grievous bodily harm? Or does it indicate an intent to do something else? Maybe a suicide by cop, that's definitely a possibility. Maybe it was a misguided belief that if he shot in the air it would scare them off.

VRP (Nov. 2, 2015) at 763-64.

Generally, legitimate trial strategy cannot serve as the basis for a claim of ineffective assistance of counsel. *Kyllo*, 166 Wn.2d at 863. Because it was a legitimate trial strategy not to move to suppress Mathes's statements to police officers, Mathes's claim of ineffective assistance of counsel on this ground fails.

### III. PROSECUTORIAL MISCONDUCT

To prevail on a claim of prosecutorial misconduct, Mathes must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Once a defendant has demonstrated that the prosecutor's conduct was improper, we evaluate the defendant's claim of prejudice under two different standards of review, depending on whether the defendant objected to the misconduct at trial. *Emery*, 174 Wn.2d at 760.

If the defendant did not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *Emery*, 174 Wn.2d 760-61. When there is no objection, we apply a heightened standard requiring the defendant to show that "(1) 'no curative instruction

19

would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

When analyzing prejudice, we do not look at the comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). Also, we presume the jury follows the trial court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010). The defendant establishes prejudice when the misconduct had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 760.

The prosecutor may not misstate the law to the jury. *State v. Swanson*, 181 Wn. App. 953, 959, 327 P.3d 67 (2014). "In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence." *State v. Reed*, 168 Wn. App. 553, 577, 278 P.3d 203 (2012). In rebuttal, a prosecutor generally is permitted to make arguments that were "invited or provoked by defense counsel and are in reply to his or her acts and statements." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). A prosecutor's allegedly improper remarks must be viewed in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. *Yates*, 161 Wn.2d at 774.

A.      *Misstating the State's Burden To Prove Intent*

Mathes argues that "[b]y arguing that by merely firing his revolver, Mathes was guilty of first degree assault, the prosecutor relieved the state of the burden of proving the intent element of first degree assault," and consequently committed prosecutorial misconduct. Br. of Appellant

40. Because the State merely argued the evidence and reasonable inferences therefrom, we disagree with Mathes.

A prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence. *Reed*, 168 Wn. App. at 577. "'Intent to commit a crime may be inferred if the defendant's conduct and surrounding facts and circumstances plainly indicate such an intent as a matter of logical probability.'" *State v. Vasquez*, 178 Wn.2d 1, 8, 309 P.3d 318 (2013), (quoting *State v. Woods*, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)). Our Supreme Court has held that "[p]roof that a defendant fired a weapon at a victim is, of course, sufficient to justify a finding of intent to kill." *State v. Hoffman*, 116 Wn.2d 51, 84-85, 804 P.2d 577 (1991). Similarly, evidence of the number of shots fired in the direction of the victims sufficed to establish the required intent to inflict great bodily harm.

Here, viewed in their entirety, the State's comments during closing argument did not misstate the law. Rather, the State was simply arguing that the evidence showed Mathes's intent to inflict great bodily harm. During its closing argument, the State properly explained that the difference between first degree assault and second degree assault is the intent to inflict great bodily harm and intent to cause fear and apprehension, respectively. The State argued that Mathes had obviously committed second degree assault by pointing a firearm at the officers and causing fear and apprehension. The State went on to argue that Mathes's act of shooting the gun at the officers demonstrated his intent to cause great bodily harm:

> Great bodily harm means a risk of death. You shoot someone and you hit them, you cause death. When you pull that trigger on a gun, you know what the result is.
>     You have intent, you have a definition of intent. It's act with objective or purpose. The trigger wasn't accidentally pulled. . . . Mr. Mathes didn't accidentally point it towards these deputies who are coming up the driveway.

21

> You heard Deputy Adams say that he spoke to the defendant, the defendant said his intention was to hurt himself and not anyone else. Especially the police.
> Well, when you go back to your definition of circumstantial evidence, and your common sense based upon the facts of what happened. The fact that the defendant is hiding behind a car and is firing. [If] [h]e didn't want to hurt the police then he didn't need to fire.
> Simply put, [if] is intent was not to hurt the police, then he didn't have to fire at them.
> The very fact that he pulled the trigger tells you what his intent was.

VRP (Nov. 2, 2015) at 749-50.

These comments did not amount to a misstatement of the law. Rather, the State argued the evidence and expressed reasonable inferences from that evidence. Consequently, Mathes's claim on this ground fails.

B.    *Eliciting a Comment on Mathes's Credibility*

After Deputy Gray testified that Mathes, while he was hospitalized, asked her if he had hurt anyone and seemed genuinely interested if anybody was hurt, the State asked Deputy Gray, "[D]id [Mathes] seem to care if anybody was hurt?"[9] VRP (Oct. 27, 2015) at 492. Mathes contends that this question constituted asking "one witness to comment on the credibility of another witness," and was therefore prosecutorial misconduct. Br. of Appellant 43, citing *State v. Casteneda-Perez*, 61 Wn. App. 354, 362, 810 P.2d 74 (1991). We disagree.

As Mathes points out, it is misconduct to ask one witness to comment on the credibility of another witness. *State v. Ramos*, 164 Wn. App. 327, 334, 263 P.3d 1268 (2011). However, whether or not Mathes "seemed to care if anybody was hurt" while he was hospitalized did not implicate Mathes's truthfulness.

---

[9] Deputy Gray's response to the allegedly improper question was, "That's difficult for me to say, but he was definitely interested if someone had been hurt." VRP (Oct. 27, 2015) at 492.

Most importantly, because Mathes did not object to this question at trial he is deemed to have waived the issue unless he shows that the question was so flagrant and ill-intentioned that a curative instruction would have been futile in obviating the prejudicial effect on the jury's verdict. *See Emery*, 174 Wn.2d at 761. Mathes contends that the question was flagrant and ill-intentioned because "[t]he jury heard that Mathes perhaps did not care if he had injured anyone." Br. of Appellant 43. His argument is unconvincing.

Mathes cannot show that the question incurably prejudiced the outcome of his trial because the question elicited testimony that actually benefited his defense theory that he did not intend to cause bodily harm to the officers. Deputy Gray's response to the State's allegedly improper question—"That's difficult for me to say, but he was definitely interested if someone had been hurt."—was equivocal at worst, and given the bulk of other evidence regarding Mathes's concerns was unlikely to undercut the defense theory. VRP (Oct. 27, 2015) at 492. Furthermore, the State never brought up the question again; no one ever argued that Mathes's concern for whether he had hurt anyone was insincere. Thus, Mathes has waived this issue because he fails to show that the prosecutor's actions were so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice.

IV. CUMULATIVE ERROR

Mathes's also contends that the cumulative effect of the alleged errors during his trial denied his right to a fair trial. Because Mathes shows no error, let alone multiple errors, his claim fails.

The cumulative effects of errors may require reversal, even if each error on its own would otherwise be considered harmless. *See State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984).

Mathes cannot show that the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness. *Coe*, 101 Wn.2d at 789. The jury heard an abundance of evidence and was properly instructed on how to weigh that evidence. None of Mathes's claimed errors by the trial court, defense counsel, or the prosecutor undermined his right to a fair trial or the validity of his convictions.

## V. DOUBLE JEOPARDY

Mathes's argues that his convictions for both kidnapping and harassment violates the prohibition against double jeopardy. We disagree.

The double jeopardy clauses of the state and federal constitutions provide, among other things, that a defendant will not suffer multiple punishments for the same crime. *See* U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). Where a defendant is convicted under multiple criminal statutes for a single act, the court must determine whether the legislature intended multiple punishments, first by looking to the statutory language and alternatively by employing the "same evidence" test. *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 536-37, 167 P.3d 1106 (2007) (citing *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

Where, as here, the language of the statutes are silent on this point, we apply the "same evidence" test. *State v. Louis*, 155 Wn.2d 563, 569, 120 P.3d 936 (2005). "Under the same evidence test, double jeopardy is deemed violated if a defendant is 'convicted of offenses that are identical both in fact and in law.'" *Louis*, 155 Wn.2d at 569 (quoting *State v. Calle*, 125 Wn.2d 769, 777, 888 P.2d 155 (1995)). In addition to comparing elements of the offenses, Washington courts also look at whether the evidence proving one crime also proved the second crime.

*Orange*, 152 Wn.2d at 820-821. "If each offense requires proof of an element not required in the other, where proof of one does not necessarily prove the other, the offenses are not the same and multiple convictions are permitted." *Louis*, 155 Wn.2d at 569. We review double jeopardy claims de novo. *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 979-80, 329 P.3d 78 (2014).

A.      *Kidnapping and Harassment Are Not the Same "In Law"*

Kidnapping as charged here, required proof that Mathes intentionally abducted Toste with the intent to inflict extreme mental distress on her. Harassment, as charged here, required proof that Mathes knowingly threatened to kill Toste immediately or in the near future and that Mathes's words or conduct placed Toste in reasonable fear that the threat to kill would be carried out.

The two offenses are not the same in law. The kidnapping required proof of an "abduction" and the intent to inflict extreme mental distress. No such element appears in the harassment charge. Mathes argues that because "abduct" means "to restrain a person by using or threatening to use deadly force," the State necessarily proves the harassment charge by proving kidnapping. Br. of Appellant 46. However, kidnapping requires that the abduction be performed with the intent to inflict emotional distress, but no such intent element is required for harassment. Furthermore, kidnapping may include a threat of deadly force but there is no requirement that the threat placed Toste in reasonable fear that the threat would be carried out, as is required by harassment. Stated another way, kidnapping requires abduction with intent to inflict emotional distress while harassment does not. And harassment requires reasonable fear while kidnapping does not. The two offenses are therefore not the same in law.

B.      *The Kidnapping and Harassment Charges Are Not the same "In Fact"*

The second question is whether the two crimes are the same in fact. *Orange*, 152 Wn.2d at 820-21. Mathes argues that because the two crimes could have been based on the same act—Mathes first pulling the gun and threatening to kill Toste—the evidence sufficient to prove harassment also proved kidnapping.

However, the evidence supporting the harassment conviction was not sufficient to prove his kidnapping conviction. As previously discussed, a key difference between harassment and kidnapping is the element of abducting, or restraining the victim's movements. Toste testified that after Mathes first pulled the gun on her, she and Mathes continued to talk for several more hours. Toste did not mention feeling afraid to speak freely or being unable to leave the house until she describes Mathes holding the gun to her head while she was on the phone with her daughter, which occurred sometime in the early hours of the morning. Thus the kidnapping conviction was based on Mathes's continuing course of conduct from the time he pulled the gun until the event ended with the shootout with police. Contrary to Mathes's argument on appeal, the kidnapping and harassment convictions could not have been based on the same act.

Consequently, Mathes's convictions for kidnapping and harassment are not the same in law or in fact and do not violate the prohibition on double jeopardy.

## VI. Sentencing

Mathes's argues that the trial court erroneously imposed Mathes's sentences for his two first degree assault convictions consecutively rather than concurrently because the two assaults did not rise from "separate and distinct" conduct. Br. of Appellant 47. However, Mathes waived this issue by failing to raise it below and therefore we do not consider his argument.

26

RCW 9.94A.589(1)(b) requires consecutive sentences for "two or more serious violent offenses arising from separate and distinct criminal conduct." In considering whether a defendant committed "separate and distinct" crimes for purposes of RCW 9.94A.589(1)(b), sentencing courts apply the "same criminal conduct" factors set forth in RCW 9.94A.589(1)(a). *State v. Price*, 103 Wn. App. 845, 855, 14 P.3d 841 (2000). If two crimes do not satisfy the "same criminal conduct" factors, they are deemed "separate and distinct." *Price*, 103 Wn. App. at 855.

To preserve the issue for appeal, a defendant must argue to the sentencing court that crimes were the same criminal conduct. RAP 2.5; *State v. Nitsch*, 100 Wn. App. 512, 524-25, 997 P.2d 1000 (2000). Whether convictions should be considered same criminal conduct is (1) a factual question for the sentencing court to resolve, and (2) an issue that is waived if not raised. A sentencing court does not have the responsibility to independently perform a same criminal conduct analysis. *Nitsch*, 100 Wn. App. at 524-25. Because Mathes did not argue to the sentencing court that the two assault convictions were the same criminal conduct, he waived the issue.[10]

STATEMENT OF ADDITIONAL GROUNDS

I. INEFFECTIVE ASSISTANCE OF COUNSEL

In his SAG, Mathes makes additional arguments regarding his counsel's allegedly ineffective assistance. He makes a general statement about "overall lack to participate in the adversarial process," lack of preparation of a reasonable defense theory, and failure "to properly

---

[10] Moreover, because the two assaults involved separate victims, they arose from separate and distinct conduct. *Price*, 103 Wn. App. at 855.

prepare or argue motions." SAG 2. Mathes also contends that his counsel rendered ineffective assistance by failing to object to the prosecutorial misconduct he argues in his opening brief, and by failing to request a curative instruction for Detective Green's testimony. Finally, Mathes contends that the cumulative effect of these errors prejudiced his right to a fair trial.

Insofar as Mathes's argument is that his defense counsel did not include Mathes in the adversarial process, nothing in the record supports his claim. We cannot address on direct appeal allegations that refer to matters outside the record on review. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

As to whether Mathes's defense counsel presented a reasonable defense theory, we presume that counsel's performance was reasonable. When trial counsel's actions involve matters of trial tactics, we hesitate to find ineffective assistance of counsel. Mathes's counsel presented coherent defense theories; nothing in the record suggests deficient performance.

Because the State's question for Deputy Gray and the State's closing argument were not improper, Mathes's defense counsel was not ineffective by failing to object to those instances.

Mathes also contends that Detective Green made "incorrect" statements during his testimony regarding the gun and bullet evidence. SAG 3. He describes these alleged errors as being corrected outside the presence of the jury and argues that his counsel was deficient for not requesting a curative instruction upon return of the jury. However, the colloquy conducted outside the presence of the jury revolved around how the evidence was marked and whether the gun could go back with the jury during deliberations given that it had no trigger lock. Defense counsel, the State, and the trial court sorted through these logistical issues and the jury was invited back into the courtroom. It is unclear what kind of curative instruction Mathes believes

should have been issued at that point. We hold that defense counsel's failure to request an instruction was not deficient performance and therefore Mathes's argument fails.

Finally, Mathes suggests that the cumulative errors of his defense counsel combined to prejudice his right to effective assistance. However, because we hold that Mathes's defense counsel was not deficient, Mathes's argument on this ground fails as well.

## II. TAINTED CRIME SCENE

Mathes asserts that Kitsap County sheriffs violated their regulations, policies, and protocols by improperly involving themselves in the investigation of the crime scene and that as a result the crime scene was tainted. Mathes contends that "some sort of curative instruction" should have been given "as to the admissibility of evidence and testimony" about the crime scene. SAG 5.

However, at trial Mathes did not object on any such grounds to any of the crime scene evidence or testimony of the investigators. "A party cannot appeal a ruling admitting evidence unless the party makes a timely and specific objection to the admission of the evidence." *State v. Avendano-Lopez*, 79 Wn. App. 706, 710, 904 P.2d 324 (1995) (citing ER 103). The failure to object to the admission of evidence at trial or to testimony from State witnesses precludes appellate review. *State v. Perez-Cervantes*, 141 Wn.2d 468, 482, 6 P.3d 1160 (2000).

Consequently, we hold that Mathes's argument is waived.

## CONCLUSION

We affirm Mathes's convictions and sentence.

29

No. 48401-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Maxa, A.C.J.

_____
Sutton, J.