
# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 74706-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| SHANE RYAN CHAMBERLAIN, | UNPUBLISHED OPINION |
| Appellant. | FILED: January 22, 2018 |

LEACH, J. — Shane Chamberlain appeals his conviction for first degree murder of Philip Hamlin and first degree attempted murder of Bethany Hamlin. He claims his counsel was ineffective for failing to pursue a diminished capacity defense. Because he cannot show from the record before us that a diminished capacity defense was available, this claim fails. We affirm.

## Background

In 2013, Philip Hamlin was 96 years old and employed a number of people to manage his household. In spring of that year, Adrena Chamberlain began work as Philip Hamlin's primary caretaker. Adrena[1] and her husband, Shane Chamberlain, moved into a guesthouse adjoining the main house so she could be available to Hamlin. Around September 2013, Chamberlain began working for Hamlin, doing maintenance projects around the property. Hamlin's granddaughter, Bethany, also worked as a part-time housekeeper for Hamlin.

---

[1] To avoid confusion, we refer to Adrena Chamberlain and Bethany Hamlin by their first names. We intend no disrespect.

Chamberlain would follow Bethany as she did her housework, and they would talk. In December 2013, Chamberlain began expressing some frustration with his situation. He told Bethany that he felt trapped working at the house. He also told her about some relationship trouble with Adrena.

On January 25, 2014, Chamberlain attacked Bethany and shot and killed Hamlin. That morning, Chamberlain had followed Bethany as she cleaned and talked to her. Chamberlain talked about his relationship problems and told Bethany that he and Adrena had mentioned divorce. Chamberlain had moved out of the guesthouse a week earlier and was temporarily living with an aunt. Bethany observed that Chamberlain seemed calmer than she would have expected under the circumstances.

After Bethany prepared lunch for Hamlin, Hamlin took his customary nap. After lunch, Bethany was vacuuming the office. Chamberlain was repairing a light fixture nearby. Chamberlain left briefly and returned with a crowbar, which he used to work on the light fixture. When Bethany turned around, she saw Chamberlain standing behind her, holding the crowbar, and looking at it. She continued vacuuming. The next thing she remembers is seeing a "really bright light" and being cold on the ground. Chamberlain approached Bethany, swinging the crowbar toward her. He hit her repeatedly about the head with the crowbar.

When Bethany was next aware, she was lying on the floor, and Chamberlain was gone. Bethany fled to a neighbor's patio where she hid. Back at the house

she heard footsteps and a deep loud wordless scream. When the footsteps receded, Bethany continued to flee to a neighbor's house where she called 911.

Chamberlain also called 911. He reported that he had murdered his boss and stated, "I broke." He told the 911 operator that he did not want to harm himself and requested that the police take him in to custody as soon as possible. Chamberlain waited in the residence driveway for the police to arrive. Police found Hamlin inside, dead from a gunshot wound to the head. Police found a crowbar and a handgun next to the pool outside the house.

A post to Chamberlain's Facebook[2] page about half an hour before Chamberlain attacked Bethany stated, "Sometimes, good people do horrible things."

The State charged Chamberlain with first degree murder and attempted first degree murder. At trial, Chamberlain's counsel argued that the State had failed to prove premeditation beyond a reasonable doubt. A jury found Chamberlain guilty on both counts.[3]

At sentencing, defense counsel argued that the court should consider Chamberlain's mental health condition a mitigating factor when sentencing him. Counsel submitted a letter from Dr. Mark McClung, opining on Chamberlain's mental condition. Counsel stated,

> While Dr. McClung did not find mental health issues that rose to the level of establishing a diminished capacity or insanity defense for the

---

[2] An online social media and social networking service.
[3] Chamberlain was also charged with and convicted of first degree assault, but the conviction was dismissed to avoid a double jeopardy issue.

current charges, his diagnosis and conclusions support the mitigating factor that Mr. Chamberlain's [sic] was acting under a compulsion, and with impulsivity which significantly affected his conduct.

The trial court considered various mitigating circumstances but denied Chamberlain's request for an exceptional sentence downward.

Chamberlain appeals his conviction.

## Analysis

Chamberlain claims that his counsel was ineffective because he did not pursue a diminished capacity defense. Claims of ineffective assistance present mixed questions of law and fact, which we review de novo.[4] We examine the entire record to decide whether the appellant received effective representation and a fair trial.[5] To succeed in an ineffective assistance claim, Chamberlain must show that his attorney's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced him.[6]

Chamberlain specifically claims that his counsel decided not to present a diminished capacity defense under the mistaken belief that the defense was unavailable. "Reasonable conduct for an attorney includes carrying out the duty to research the relevant law."[7] "Failure of defense counsel to present a diminished capacity defense where the facts support such a defense has been held to satisfy both prongs of the Strickland test."[8] The record shows that defense counsel

---

[4] In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).
[5] State v. Hicks, 163 Wn.2d 477, 486, 181 P.3d 831 (2008).
[6] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).
[7] State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).
[8] State v. Tilton, 149 Wn.2d 775, 784, 72 P.3d 735 (2003).

explored the diminished capacity defense. Counsel stated that the evidence did not support the defense. Chamberlain does not show that his counsel reached an incorrect conclusion about the defense.

Chamberlain's argument rests on the premise that the evidence available to his attorney supported a diminished capacity defense. But the record before us is insufficient to show that a diminished capacity defense was available.[9] "To maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the specific intent to commit the crime charged."[10] The defendant must present evidence that "logically and reasonably connects the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged."[11]

The required intent for first degree murder is premeditation.[12] The jury instructions explained premeditation as follows:

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

---

[9] Although the record available on direct appeal is not sufficient to show facts to support a diminished capacity defense, Chamberlain may obtain evidence that would support the defense and submit it in a personal restraint petition.

[10] State v. Ellis, 136 Wn.2d 498, 521, 963 P.2d 843 (1998).

[11] State v. Griffin, 100 Wn.2d 417, 418-19, 670 P.2d 265 (1983).

[12] A person commits first degree murder when, "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.32.030(1)(a).

Thus, to show that a diminished capacity defense was available, Chamberlain must show that he had a mental condition that prevented him from forming the purpose of killing Hamlin and Bethany.

To show evidence of this, Chamberlain mainly relies on Dr. McClung's letter. Dr. McClung interviewed Chamberlain twice. He was familiar with the facts of the case and with Chamberlain's medical history. Dr. McClung's letter states that he would have testified that Chamberlain meets the criteria for "Borderline Personality Disorder." The letter also states that Chamberlain said he stopped taking antidepressant medication because it makes him "'act dangerous and impulsive.'" In addition, Dr. McClung opines that Chamberlain "may have experienced dissociation, causing some emotional and sensory detachment from the reality of the situation and his surroundings." He explains,

—Mr. Chamberlain reports impaired memory for parts of his alleged crime. He said that he did not recall starting to attack Bethany Hamlin, or having any conscious awareness of a reason for doing so. He describes feelings of emotional detachment and unreality during the attacks. His former roommate (David Goods) described Mr. Chamberlain's rage episodes as "he seemed to be at times two different people." When Mr. Chamberlain calmed down, he would say he didn't know what was wrong with him. Mr. Goods related that normally he wasn't a violent person, but there were times when he "just seemed not to be himself . . . . he just was a totally different person and he could be violent." These observations, taken together with Mr. Chamberlain's report of spotty memory and a sense of unreality, suggest that Mr. Chamberlain may experience *dissociation* at times of high emotional distress. Dissociation is an emotional process causing detachment from reality, ranging from a feeling of detachment, to memory loss, to the phenomenon of multiple personalities. Dissociation is involuntary and not under the control of the person experiencing it. His diagnosis of Borderline Personality Disorder increases the chance of having dissociation.

(Alteration in original.)

Dr. McClung's letter shows the availability of ample evidence to prove that Chamberlain suffered from a serious mental disorder. But the letter lacks any opinion about Chamberlain's ability to form the culpable mental state. While symptoms of dissociation may support a theory of diminished capacity,[13] Chamberlain must also identify some evidence showing that those symptoms affected Chamberlain's ability to premeditate the crime.[14]

Chamberlain claims that State v. Ellis[15] and State v. Mitchell[16] show that the information in Dr. McClung's letter is sufficient to support a diminished capacity defense. We disagree. In Ellis, our Supreme Court held that courts should use ER 702, 401, and 402 to determine the admissibility of expert testimony about diminished capacity.[17] And in Mitchell, we held that "the admissibility of expert testimony under ER 702 does not require the expert to testify with certainty to the ultimate question of fact."[18] These cases illustrate the standards for admissibility of expert testimony and relevance, not the standard for the prima facia showing required for the defense. Chamberlain confuses these tests. When determining the admissibility of the expert testimony, as noted in Ellis and Mitchell, the court

---

[13] See State v. Martin, 169 Wn. App. 620, 625, 281 P.3d 315 (2012).

[14] State v. Stumpf, 64 Wn. App. 522, 528, 827 P.2d 294 (1992) ("To support a diminished capacity instruction, there must not only be substantial evidence of the mental disorder, but the evidence must also explain *the connection between* the disorder and the diminution of capacity." (citing Griffin, 100 Wn.2d at 418-19; State v. Edmon, 28 Wn. App. 98, 103-04, 621 P.2d 1310 (1981))).

[15] 136 Wn.2d 498, 963 P.2d 843 (1998).

[16] 102 Wn. App. 21, 997 P.2d 373 (2000).

[17] Ellis, 136 Wn.2d at 521.

[18] Mitchell, 102 Wn. App. at 22.

considers whether the opinion is relevant and would be helpful to the jury.[19] In this case, however, we are asked to decide whether the record contains sufficient evidence to support each element of the defense. Contrary to Chamberlain's claim, Ellis and Mitchell do not hold that testimony about the defendant's mental disorder is enough to support a diminished capacity defense without some expert testimony showing a causal connection to intent.

We further distinguish Ellis and Mitchell based on their facts. In Ellis, the expert testimony explained the causal connection between Ellis's mental disorder and the lack of intent.[20] Similarly, Mitchell introduced expert testimony that he suffered from a mental disorder that could have interfered with his knowledge.[21] Chamberlain has not introduced similar evidence of causation.

In sum, Chamberlain does not show that any expert would have testified that he had a mental disorder that impaired his ability to form a culpable intent. Because Chamberlain does not show that counsel could have presented any evidence on an essential element of a diminished capacity defense, Chamberlain fails to demonstrate that his counsel's performance was deficient for failing to pursue the defense.[22] For this reason, his ineffective assistance claim fails and we need not consider the prejudice prong.

---

[19] Ellis, 136 Wn.2d at 517; Mitchell, 102 Wn. App. at 26-27.

[20] Ellis, 136 Wn.2d at 520-21.

[21] Mitchell, 102 Wn. App. at 24.

[22] See State v. Turner, 143 Wn.2d 715, 730, 23 P.3d 499 (2001) (concluding that Turner failed to show his counsel's performance was deficient because the court could not determine from the record on appeal that any expert would have testified about his ability to form the specific intent required).

Chamberlain asks the court to deny the State appellate costs based on his indigency. We generally award appellate costs to the substantially prevailing party on review. But where, as here, a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency."[23] If the State has evidence of significant improvement in Chamberlain's financial circumstances since the trial court's finding, it may file a motion for costs with the commissioner.

## Conclusion

Because Chamberlain does not show that defense counsel reached an incorrect conclusion about the diminished capacity defense, he does not show that counsel's performance was deficient for failing to pursue that defense. We affirm.

Leach, J.

WE CONCUR:

Spearman, J.

Cox, J.

---

[23] RAP 14.2.